IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | |
|---|---|
| HUMANA INC. )<br>   Plaintiffs, )<br>)<br>v. )<br>)<br>LPH HEALTHCARE, LLC d/b/a, )<br>LAREDO EMERGENCY ROOM, )<br>)<br>   Defendant. ) | Case No. 5:23-cv-00141 |

## COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff Humana Inc. ("Humana"), by and through their undersigned counsel, hereby commence this action against Defendant LPH Healthcare, LLC d/b/a Laredo Emergency Room ("Laredo ER") and further states and alleges as follows:

## NATURE OF THE ACTION

1. Health care fraud is running rampant in the United States and the COVID-19 pandemic has only exacerbated the problem.

2. Determined not to miss an opportunity to profiteer, Defendant Laredo ER engaged in a deliberate price gouging scheme to exploit the COVID-19 pandemic by overcharging health insurers, such as Humana, for COVID-19 diagnostic testing claims at grossly inflated prices.

3. Laredo ER's scheme is simple. Pursuant to laws passed in response to the global pandemic, health insurers and plans were required to cover certain COVID-19 diagnostic testing at no cost to the patient. The prices for the covered tests were established in one of two ways: the provider and insurer may have a negotiated rate, and if not, the price is equal to the provider's publicly posted cash price. *See* Coronavirus Aid, Relief, and Economic Security Act (CARES Act),

1

Pub. L. No. 116-136, § 3202(a) (2020). The "cash price" is the price an individual that pays with cash, or a cash equivalent, would pay for the test. *See* 45 C.F.R. § 182.20.

4. Instead of posting reasonable and accurate cash prices, Laredo ER initially posted no price and then later posted exorbitant "cash prices" on its website for purposes of the CARES Act.

5. Laredo ER's scheme is illustrated by the claims it submitted to Humana. The BIO-Fire PCR Test (large panel PCR testing) is the primary type of COVID-19 test that Laredo ER claims to have performed for Humana members. Laredo ER submitted over 600 claims for the BIO-Fire Test to Humana. Laredo ER's cash price for the test is and was $7,989.20. For reference, Laredo ER's cash price is nearly 19 times higher than the rate set by Medicare – $416.78 – for the exact same test. Humana paid the exorbitant "cash price" for these tests billed to it by Laredo ER over the course of the pandemic, resulting in millions of dollars paid to Laredo ER.

6. Laredo ER's purported cash price is not only excessive and objectively unreasonable, it is also intentionally deceptive. While Laredo ER represented to insurers that its established cash price was $7,989.20 per test, Laredo ER was in fact charging cash paying patients $250-$500, one-sixteenth of the price posted as the "cash price" on its website. Thus, Laredo ER's posted "cash price" was a sham.

7. In total, Laredo ER submitted over $3.3 million in inflated and otherwise improper claims to Humana. Given its own obligations under the CARES Act to pay for diagnostic testing, Humana had no choice but to pay Laredo ER for these claims. Although Humana paid these claims pursuant to the CARES Act requirements, nothing precludes Humana from recovering the improper amounts paid to Laredo ER for its price gouging scheme.

8.      Through this civil action, Humana seeks compensation for the injuries it has incurred because of Laredo ER's conduct. In addition, Humana seeks punitive damages, and attorneys' fees.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim asserted herein occurred in this District.

## THE PARTIES

11.     Plaintiff Humana Inc. is a Delaware corporation with its principal place of business in Louisville, Kentucky.  Humana and its subsidiaries are providers of healthcare related services. Humana operates its insurance businesses through a variety of wholly-owned subsidiaries, all of which have assigned their relevant claims to this action to Humana.

12.     Plaintiff Humana Insurance Company is a Wisconsin company authorized to do business as a life, accident, and health company by the Department of Insurance in the state of Texas.

13.     Defendant LPH Healthcare, LLC is a Texas organization with its principal place of business in Laredo, Texas.

## FACTUAL BACKGROUND

**Humana's Health Plans and Relationship with Providers**

14. Humana is one of the nation's largest health benefits companies and administers a variety of healthcare plans and policies of insurance in various states and regions throughout all 50 States and Puerto Rico.

15. Humana offers both fully funded health plans, and provides administrative services for self-funded plans.

16. Some of the health plans in issue in this case are ERISA[1] health and welfare benefit plans. Humana serves as a claim administrator for each plan and exercises discretionary authority over administration of the plans. Pursuant to its agreements with the plan sponsors, Humana has been delegated the authority to pursue recovery of payments made by Humana on behalf of certain self-funded plans covered by ERISA.

17. Humana will provide further details concerning the health plans and claims at issue in this litigation following the entry of a HIPAA qualified protective order.

18. Humana has contractual relationships with certain health care providers known as "participating" providers. The providers render services to Humana members at negotiated rates.

19. Humana members may also receive services from "non-participating" providers who do not have contracts with Humana that establish pre-negotiated rates. These are known as "out-of-network" services.

20. Generally, non-participating providers set their own rates for services rendered to patients, subject to state and federal regulations.

21. Laredo ER is a non-participating provider with Humana.

---

[1] The Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq. ("ERISA").

**Humana's Claims Adjudication**

22.     Humana adjudicates millions of claims each month from providers across the country. It expressly relies on providers to make accurate representations to Humana when submitting claims.

23.     Providers submit claims to Humana on industry-standard forms or their electronic equivalent. When a healthcare provider submits a claim for services provided to a Humana member, the provider is certifying that the information is truthful and accurate.

24.     The information included on the claim forms submitted is material to Humana and is relied upon by Humana in adjudicating the claim.

**COVID-19 Pandemic and Testing**

25.     On March 11 2020, the World Health Organization ("WHO") declared the COVID-19 outbreak a global pandemic.[2]

26.     Initially, in the United States, the CDC controlled the only testing operations.[3] However, in February 2020, due to the rapid spread of COVID-19, the Secretary of the U.S. Department of Health and Human Services ("HHS") authorized the emergency use of *in vitro* diagnostic devices for the detection of COVID-19.[4]

27.     Since that time, several types of COVID-19 tests were approved for emergency use and have become available to the public including the following:

| Test Type | Description | Billing Code |
|---|---|---|
| COVID-19 Rapid Antigen Test | Infectious agent antigen detection by immunoassay with direct optical observation; severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) | 87811 |

---

[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7569573/.
[3] https://www.science.org/content/article/united-states-badly-bungled-coronavirus-testing-things-may-soon-improve.
[4] https://www.fda.gov/medical-devices/emergency-use-authorizations-medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices

| COVID-19 PCR Test | Infectious agent detection by nucleic acid (DNA or RNA); severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) | 87635 |
| --- | --- | --- |
| Bio-Fire PCR Test | Infectious disease (bacterial or viral respiratory tract infection), pathogen-specific nucleic acid (DNA or RNA), 22 targets including severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), qualitative RT-PCR, nasopharyngeal swab, each pathogen reported as detected or not detected | 0202U |

28.     Accurate and efficient testing for COVID-19 was a key measure to end the pandemic.

**The FFCRA and CARES Act**

29.     Congress passed the Families First Coronavirus Response Act ("FFCRA") on March 18, 2020 in response to the COVID-19 pandemic. *See* Pub. L. No. 116-127, 134 Stat. 178 (2020).

30.     The FFCRA required health insurers to cover approved forms of COVID-19 testing at no costs to patients. *See* FFCRA § 6001(a).

31.     Congress supplemented the FFCRA on March 27, 2020 with the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). *See* Pub. L. No. 116-136, 134 Stat. 281 (2020).

32.     The CARES Act described how the pricing for FFCRA-required coverage for diagnostic testing is to be established. CARES Act § 3202.

33.     Specifically, the CARES Act provides, in relevant part,

> (a) REIMBURSEMENT RATES. – A group health plan or a health insurance issuer providing coverage of items and services described in section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116-127) with respect to an enrollee shall reimburse the provider of the diagnostic testing as follows:
>
>     …

> (2) If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website, or such plan or issuer may negotiate a rate with such provider for less than such cash price.

CARES Act § 3202(a).

34. The CARES Act also required that providers establish and publicly post on their websites an accurate "cash price." *See* CARES Act § 3202(b)(1) ("each provider…shall make public the cash price for such test on a public internet website of such provider.").

35. "Cash price means the charge that applies to an individual who pays cash (or cash equivalent) for a COVID-19 diagnostic test." 45 C.F.R. § 182.20.

36. CMS explained this definition in its interim final rule as follows:

> The "cash price" is generally analogous to the "discounted cash price" as defined at 45 CFR 180.20 for purposes of the Hospital Price Transparency final rule. As we explained in that rule, providers often offer discounts off their gross charges or make other concessions to individuals who pay for their own care (referred to as self-pay individuals)…We also state that the discounted cash price may be generally analogous to the "walk-in" rate that would apply to all self-pay individuals, regardless of insurance status, who pay in cash at the time of the service, and that such charges are often lower than the rate the hospital negotiates with third party payers because billing self-pay individuals would not require many of the administrative functions that exist for hospitals to seek payment from third party payers (for example, prior authorization and billing functions). It is therefore our expectation that the "cash price" established by the provider will be generally similar to, or lower than, rates negotiated with in-network plans and insurers.

85 RF at 71152.

37. The requirements relating to cash posted price and coverage for diagnostic testing under the FFCRA and the CARES Act subsequently expired when the federal Public Health Emergency expired on May 11, 2023.

38. However, while it was in place, CMS raised concerns that the cash price requirement would lead to "price gouging," and requested comment on "authorities and safeguards that could be used to mitigate concerns for price gouging both for group health plans and issuers and for consumers receiving a COVID-19 diagnostic test. 85 FR at 71153. It explained that while "most providers have been pricing COVID-19 tests at reasonable levels, generally consistent with reimbursement rates set by the Medicare program,…some providers have not done so and are using the public health emergency as an opportunity to impose extraordinarily high charges."[5]

39. CMS was not the only agency to raise concerns about price gouging. Indeed, the Texas Department of Insurance issued a Bulletin on November 2, 2020 reminding the public that "it is a crime to knowingly charge two different prices for the same product or service and the higher price is charged because an insurer will pay all or part of that cost." TDI Commissioner's Bulletin #B-0037-20.

**Laredo ER's Deceptive "Cash Price"**

40. Laredo ER is freestanding emergency medical care facility that offered through the course of the pandemic and continues to offer COVID-19 testing.

41. Laredo ER offers the following two types of COVID-19 testing:

   a. **COVID-19 PCR testing**: These tests require a nasal or oral swab of the patient. They detect genetic material indicating COVID-19 infection, and most labs are able to produce results for the COVID-19 PCR test within 24 hours.

   b. **Bio-Fire PCR testing**: These tests are like COVID-19 PCR tests, but detect 21 other respiratory pathogens in addition to COVID-19. These are

---

[5] *See* CMS, *FAQs about Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act Implementation Part 44* (Feb. 26, 2021), at https://www.cms.gov/files/document/faqs-part-44.pdf

significantly more expensive than COVID-19 PCR tests and provide no additional benefits related to COVID-19 infection.

42. Laredo ER's purported cash prices for these two tests are excessive and objectively unreasonable.

43. Laredo ER charged insurers like Humana the exorbitant rate of $7,989.20 for Bio-Fire PCR testing and $1,020.00 for COVID-19 PCR testing.

44. Laredo ER's website provides the following "cash price" information for the Bio-Fire test:[6]

| Infectious disease(bacterial or viral respiratory tract infection pathogen-specific nucleic acid DNA or RNA 22 targets severe acute resp syndrome coronavirus 2 SARS CoV2 | $ 7,989.20 |
|---|---|

45. Laredo ER's public website provides the following "cash price" information for a COVID-19 PCR test:[7]

| Infectious agent detection by nucleic acid (DNA or RNA); severe acute respiratory syndrome coronavrius 2 (SARS-CoV-2) (C | $ 1,020.00 |
|---|---|

46. Although it offered both types of testing, Laredo ER primarily administered the more expensive Bio-Fire test.

47. Laredo ER's "cash price" is substantially out of step with those prices CMS has deemed "reasonable" – i.e., prices "generally consistent with reimbursement rates set by the Medicare program." Indeed, the Medicare rate for the Bio-Fire test was $416.78. Laredo ER has been charging nearly 19 times more than the Medicare rate.

48. Laredo ER's price is also substantially higher than the price charged by other hospitals and labs, and bears no relationship to the cost of performing the test.

---

[6] See https://assets.website-files.com/5fe434a59a1a2775c59b72ea/634481183ca0f586ec57636d_LER%20FEE%20SCHEDULE.pdf
[7] Id.

49. No unusual circumstances justify Laredo ER's exceptionally high purported cash prices.

50. Under normal circumstances, Laredo ER would have no expectation that any insurer would pay its extraordinarily high price. However, Laredo ER contends that the pandemic and the CARES Act gave it free reign to force insurers to pay whatever it asked.

51. Not only were Laredo ER's charges excessive, Laredo ER knowingly and intentionally posted on its website false cash prices that did not represent the actual price Laredo ER offered to the public.

52. Laredo ER posted the price of $7,989.20 to its website, contending that to be the "cash price" for purposes of its obligation to post a "cash price" under the CARES Act. Laredo ER then submitted claims to insurers – including Humana –for payment in that amount.

53. But this price is not the "cash price" as that term is defined in the CARES Act. As discussed above, "cash price" means "the charge that applies to an individual who pays cash (or cash equivalent) for a COVID-19 diagnostic test."[8] It is "generally analogous to the 'discounted cash price'… for purposes of the Hospital Price Transparency final rule," which accounts for "discounts" providers offer "off their gross charges or…other concessions to individuals who pay for their own care."[9]

54. For individuals paying cash, Laredo ER charged a much lower price than its "cash price" of $7,989.20. Indeed, Laredo ER charged cash-paying patients $250-$500 for the Bio-Fire test, i.e., less than one-sixteenth of what it claims to be its "cash price."

55. Laredo ER knowingly and willfully executed a scheme to defraud health insurers and plans by posting a false "cash price" that Laredo ER did not actually collect from individual

---

[8] 85 FR at 71204
[9] *Id.* at 71152.

cash-paying patients. It then demanded payments of that false cash price from insurance companies like Humana.

**Humana's Special Investigations Unit's Review of Laredo ER's Claims**

56. Humana began receiving complaints about Laredo ER's billing practices early in the pandemic. Accordingly, Humana's Special Investigations Unit ("SIU") opened an investigation and began reviewing the claims Laredo ER was submitting to Humana for COVID-19 testing.

57. Humana received a complaint from a member who received a COVID-19 test at Laredo ER and Laredo ER billed Humana $9,053.14, which included $7,898.20 for the COVID test, $902.32 for an ER visit and $252.62 for pulse oximetry. That same member sent one of her employees who did not have insurance to Laredo ER and the individual was only charged a flat fee of $250 for the same test.

58. Another member reported that he went to Laredo ER due to Covid-19 symptoms and known Covid-19 exposure and received a COVID-19 test. Laredo ER billed Humana roughly $9,000 for that visit, including $7898.20 for the COVID test. The member received another test at Laredo ER within the same 2-week period. Unbeknownst to Humana, Laredo ER told him that Humana would not cover the second test because he had received a test less than two weeks prior. Laredo then charged him $250 out-of-pocket for the second test.

59. On March 25, 2021, an investigator in Humana's SIU placed a phone call to Laredo ER and spoke with a staff member. The investigator asked for the price of a COVID-19 test without insurance and was advised that Laredo ER offered a PCR test for a flat rate of $250.

60. As recently as May 2023, Laredo ER has continued to charge insurers its false "cash price" while charging actual cash-paying patients significantly less.

61. For instance, in May 2023, an individual presented to Laredo ER feeling unwell and requested a COVID-19 test. The individual was asked to pay a deposit of $250 and advised they would receive a bill in the mail for the remainder of the charges.

62. The individual subsequently received a bill for nearly $15,000, which purported to charge the individual for a Level IV emergency department visit.

63. This individual called Laredo ER's billing department to inquire about the exorbitant charges. She was asked whether she was self-pay or paying with insurance. When she advised that she was self-pay, Laredo ER advised her that she would only owe $500 total (including the $250 previously paid) and that Laredo ER "sends the [higher] bill as if it was going to be charged to an insurance."

64. The individual subsequently received a revised bill in the amount of $250. *See* Laredo ER bill attached hereto as Exhibit A.

**Laredo ER's submission of Claims to Humana**

65. Between March 25, 2020 and the present, Laredo ER submitted 781 claims to Humana for COVID-19 testing.

66. As noted above, during this time, Laredo ER offered both the COVID-19 PCR test and the Bio-Fire large-panel test. However, the Bio-Fire test is appropriate in only very limited circumstances. For example, large panel testing would not be appropriate to administer to asymptomatic individuals.

67. Despite this, and although it offered PCR testing, Laredo ER primarily submitted claims to Humana for the more expensive Bio-Fire test. Indeed, between March 25, 2020 and the present, Laredo ER submitted 647 claims for the Bio-Fire test and only 134 claims for the regular PCR test.

68. Laredo ER submitted these claims and demanded payment at its false and exorbitant "cash prices." The claims were not payable at these inflated rates. Nevertheless, because health insurers, like Humana, were required to pay providers their cash posted prices under the CARES Act, Humana paid Laredo ER's claims for COVID testing at these inflated rates. However, nothing in the CARES Act or otherwise required Humana to be subjected to extreme price-gouging by opportunistic providers like Laredo ER.

69. In total, Humana paid Laredo ER $3,373,309.82 for claims for COVID-19 tests.

## CAUSES OF ACTION

### COUNT I
### ERISA § 502(a)(3)

70. Humana incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

71. ERISA § 502(a)(3) permits actions by "a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provisions of this subchapter of the terms of the plan [.]" 29 U.S.C. § 1132(a)(3).

72. A party is entitled to equitable relief under ERISA § 502(a)(3) if: (1) a fiduciary seeks the restitution of specifically identified funds; (2) that the funds belong in good conscience to the plan; and (3) that the funds are within the defendant's possession and control.

73. Humana is the claims administrator for its members' ERISA plans and has been delegated the authority to pursue recovery of payments made by Humana on behalf of certain self-funded plans covered by ERISA. Humana seeks to recover improper payments made by those plans to Laredo ER.

74. Humana will provide additional information regarding the specific plans and claims at issue in this litigation following the entry of a HIPAA qualified protective order.

75. Humana made payments to Laredo ER for COVID-19 testing it purportedly rendered to plan members based on the "cash price" listed on the claims forms and Laredo ER's publicly available website. However, Laredo ER's cash price on the claims forms and its publicly available website was knowingly and intentionally false.

76. These payments made to Laredo ER based on its false cash price belong in good conscience to the plans.

77. These payments are within Laredo ER's possession and control.

78. These payments were made in contravention of plan terms.

79. Humana seeks recovery of these payments on behalf of the plans.

## COUNT II
## FRAUD OR FRAUDULENT CONCEALMENT

80. Humana incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows.

81. As alleged herein, Laredo ER made, or caused to be made, intentional misrepresentations of material fact relating to the COVID-19 testing claims it submitted, or caused to be submitted, to Humana for reimbursement.

82. The charge amount for the service rendered is material information to Humana.

83. Laredo ER knowingly and intentionally posted a false cash price to its website, a price it never collected or intended to collect from actual cash-paying patients.

84. Laredo ER submitted hundreds of claims to Humana with this false cash price. These claims intentionally and materially misrepresented Laredo ER's price for COVID-19 testing.

85. When Laredo ER made these intentional misrepresentations, or caused them to be made, they did so with the intent to induce Humana to rely on those misrepresentations and pay the claims based on those charge amounts.

86. Laredo ER had a duty to disclose to Humana information material to the claims that Laredo ER submitted, or caused to be submitted, so as not to mislead Humana.

87. At the time these false representations were made to Humana, Laredo ER knew that they were false, or that the representation were made recklessly, without any knowledge of the truth.

88. These misrepresentations were material to Humana's determination of how much to pay Laredo ER for each claim for COVID-19 testing.

89. Humana reasonably relied on the claims submitted to Humana, including the misrepresentations, when determining how much to pay Laredo ER for each claim.

90. Had Humana been aware that the claims contained material misrepresentations, it would not have paid the amounts it paid for the claims.

91. As a direct and proximate result of Laredo ER's material misrepresentations and omission, Humana has been damaged in an amount to be determined at trial.

## COUNT III
## NEGLIGENT MISREPRESENTATION

92. Humana incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

93. The claims submitted by Laredo ER, or caused to be submitted by Laredo ER, contained material misrepresentations, including, the charge amount for the claims.

94. These representations were either false, made without reasonable grounds for believing them to be true, made without knowledge of their truth or falsity, made without

15

reasonable case, or made under circumstances in which Laredo ER ought to have known their falsity.

95. Laredo ER had a duty to disclose to Humana information material to the claims that Laredo ER submitted, or caused to be submitted, to Humana, to avoid misleading Humana.

96. Laredo ER took on this obligation every time they filed a claim, or caused a claim to be filed.

97. Laredo ER failed to exercise reasonable care when making these false representations.

98. It was foreseeable that Humana would rely on Laredo ER's representations, given the nature of the claim payment process, and the fact that they were submitted to Humana by Laredo ER.

99. Humana justifiably and reasonably relied on Laredo ER's misrepresentations and paid the claims.

100. If Humana had been aware of the material misrepresentations, Humana would not have paid the claims as charged.

101. As a direct and proximate result of Laredo ER's misrepresentations, Humana has been damaged in an amount to be determined at trial.

## COUNT IV
## MONEY HAD AND RECEIVED/UNJUST ENRICHMENT

102. Humana incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

103. Laredo ER fraudulently submitted, or caused to be submitted, claims to Humana that misrepresented the charge amount for COVID-19 testing claims.

104. Humana, relying on Laredo ER's misrepresentations, issued reimbursements to Laredo ER based on those charge amounts.

105. Laredo ER therefore received a benefit from Humana in the form of extra reimbursements for each claim.

106. Humana conferred those benefits in reliance on the reasonable belief that the reimbursements were properly owed.

107. Laredo ER appreciated the benefit conferred by Humana.

108. Laredo ER unjustly accepted and retained those benefits.

109. Laredo ER holds these funds, which in equity and good conscience belong to Humana.

110. Laredo ER should be required to make restitution for the benefits it received, retained, and appropriated because justice and equity require such restitution.

111. Restitution is further required by public policy to promote the stability of insurance markets to avoid continuing unjust enrichment of unscrupulous providers at the expense of insurance companies and patients.

112. Humana is entitled to restitution in amount to be determined at trial, including, but not limited to all amounts Laredo ER received from Humana because of its scheme.

## COUNT V
## TEXAS THEFT LIABILITY ACT

113. Humana incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

114. Laredo ER is liable to Humana, under the Texas Theft Liability Act, for their theft of more than $3,373,309.82 from Humana.

115. Humana was in lawful possession and control of its property – i.e. money – that was unlawfully appropriated from it by Laredo ER. Humana's possession and control of the property unlawfully appropriated from it makes it an owner of that property, pursuant to Tex. Penal Code § 1.07(a)(35).

116. Laredo ER unlawfully appropriated property, in the form of approximately $3,373,309.82, from Humana, intending to permanently deprive Humana of the property, in violation of Texas Penal Code § 31.03, and is thus liable to Humana for the damages caused by the thefts.

117. Laredo ER acquired possession and control over this property from Humana without Humana's "effective consent," as that term is used and defined in Texas Penal Code §§ 31.03(b)(1) and 31.01(3).

118. Humana consent to relinquishing possession and control of this property to Laredo ER was ineffective because it was induced by deception.

119. Laredo ER unlawfully appropriated this property by inducing Humana to consent to transfer property through deception.

120. Laredo ER created, by words in the claims submitted to Humana, false impressions of facts that Laredo ER did not believe to be true, but which were likely to, and did, affect Humana's judgment as to whether it should consent to transferring possession and control of the property at issue in each transaction.

121. Humana has been harmed in the amount of property unlawfully appropriated from it through which Laredo ER submitted claims to Humana, to which Humana issued reimbursements, from which Laredo ER received transfers of said property.

122. Humana seeks to recover these damages, as well as statutory damages, court costs, and reasonable and necessary Humana attorneys' fees, as provided for by Tex. Civ. Prac. & Rem. Code § 134.005(a) and (b).

## PRAYER FOR RELIEF

WHEREFORE Humana respectfully requests judgment in its favor granting the following relief:

a. Actual and consequential damages in an amount to be determined at trial, plus interest;

b. An order obligating Laredo ER to disgorge all revenues and profits derived from their scheme;

c. An injunction prohibiting Laredo ER from continuing its scheme;

d. An award of Humana's costs, including reasonable attorneys' fees;

e. Punitive damages;

f. Any other relief this Court deems just and proper.

DATED: December 13, 2023  Respectfully submitted,

By: */s/ Raj Aujla*
Raj Aujla
Southern District Bar No. 1215554
State Bar No. 24064846
raujla@maynardnexsen.com
Lisa P. Alcantar
Southern District Bar No. 1093319
State Bar No. 24069284
lalcantar@maynardnexsen.com
Maynard Nexsen, P.C.
7373 N. Broadway St.
Suite 403, Office 1 & 2
San Antonio, Texas 78212
Telephone:  (512) 696-6557

-and-

Kirstin B. Ives (*pro hac vice to be filed*)
Megan A. Zmick (*pro hac vice to be filed*)
**Falkenberg Ives LLP**
230 W. Monroe, Suite 2220
Chicago, Illinois 60606
312-566-4803
kbi@falkenbergives.com
maz@falkenbergives.com